**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 1:26-cv-21106-KMW

PRESIDENT DONALD J. TRUMP, TRUMP PAYROLL
CORP., 401 MEZZ VENTURE, LLC, 401 NORTH
WABASH VENTURE, LLC, THC MIAMI
RESTAURANT HOSPITALITY, LLC, TRUMP
BRIARCLIFF MANOR DEVELOPMENT, LLC,
TRUMP CHICAGO RETAIL, LLC, TRUMP MIAMI
RESORT MANAGEMENT, LLC, TRUMP NATIONAL
GOLF CLUB COLTS NECK, LLC, and TRUMP
NATIONAL GOLF CLUB, LLC,

      Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A. and JAMES DIMON,

      Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR REMAND**

JONES DAY
600 Brickell Ave, Suite 3300
Miami, Florida 33131
Telephone: (305) 714-9700
Facsimile: (305) 713-9799

*Counsel for Defendants (additional appearances below)*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I. Plaintiffs Exaggerate the Fraudulent Joinder Standard........................................ 3

II. FDUTPA's Banking Safe Harbor Forecloses Liability Against Mr. Dimon..................... 5

    A. FDUTPA's safe harbor for federally regulated banks bars Plaintiffs' claim against Mr. Dimon. ....................................................................................... 5

    B. FDUTPA's safe harbor applies to Mr. Dimon because he is an "institution-affiliated party" regulated under federal banking laws. ........................................ 9

III. Plaintiffs' Allegations Are Beyond the Scope of FDUTPA ................................ 14

    A. Plaintiffs do not allege that Mr. Dimon engaged in conduct in trade or commerce for purposes of FDUTPA. ................................................................ 14

    B. Plaintiffs do not allege that they suffered any actual damages. .......................... 16

IV. Plaintiffs Do Not and Cannot Plead the Basic Facts of Their FDUTPA Claim .............. 17

CONCLUSION .................................................................................................................... 19

## TABLE OF AUTHORITIES

**Page**

CASES

*AMG Trade & Distrib., LLC v. Nissan N. Am., Inc.*,
813 F. App'x 403 (11th Cir. 2020) ..........................................................................................14

*Bankers Tr. Co. v. Basciano*,
960 So. 2d 773 (Fla. 5th DCA 2007) ......................................................................................6, 8

*Bolden v. Nautilus Insurance Co.*,
2023 WL 4614509 (11th Cir. July 19, 2023).............................................................................4

*Bongino v. Daily Beast Co.*,
477 F. Supp. 3d 1310 (S.D. Fla. 2020) ...................................................................................14

*Bowe v. Public Storage*,
106 F. Supp. 3d 1252 (S.D. Fla. 2015) ...................................................................................12

*Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*,
169 So. 3d 164 (Fla. 4th DCA 2015) ......................................................................................17

*Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*,
270 F. Supp. 3d 1340 (S.D. Fla. 2017) ...................................................................................16

*Cedars Healthcare Grp., Ltd. v. Mehta*,
16 So. 3d 914 (Fla. 3d DCA 2009) .........................................................................................17

*CMR Constr. & Roofing, LLC v. Am. Cap. Assur. Corp.*,
2021 WL 354167 (M.D. Fla. Feb. 2, 2021) .......................................................................11, 12

*Dacostagomez-Aguilar v. U.S. Att'y Gen.*,
40 F.4th 1312 (11th Cir. 2022) ...............................................................................................12

*Fed. Trade Comm'n v. Am. Standard Credit Sys., Inc.*,
874 F. Supp. 1080 (C.D. Cal. 1994) ..........................................................................................9

*FTC v. Partners in Health Care Ass'n*,
189 F. Supp. 3d 1356 (S.D. Fla. 2016) .....................................................................................7

*Ground & Pipe Techs., LLC v. Firstliner Techs., Inc.*,
  2005 WL 8163041 (N.D. Fla. Oct. 5, 2005) ...................................................................18

*Horowitz v. Laske*,
  855 So. 2d 169 (Fla. 5th DCA 2003) .............................................................................17

*Illoominate Media, Inc. v. CAIR Fla., Inc.*,
  841 F. App'x 132 (11th Cir. 2020) ...........................................................................18, 19

*In re Kachkar*,
  769 F. App'x 673 (11th Cir. 2019) ...................................................................................5

*In re Kapila*,
  762 F. App'x 991 (11th Cir. 2019) ...................................................................................6

*In the Matter of John Stumpf Former Chairman and Chief Executive Officer Wells
  Fargo Bank, N.A. Sioux Falls, South Dakota*,
  Dkt. AA-EC-2019-83, No. 2020-004 (O.C.C. Jan. 22, 2020)
  https://www.occ.gov/static/enforcement-actions/ea2020-004.pdf.......................................10

*In the Matter of Patrick Adams Former President and Chief Executive Officer
  T Bank, N.A. Dallas, Texas*,
  Dkt. AA-EC-11-50, 2014 WL 8735096 (O.C.C. Sept. 30, 2014) .........................................10

*KC Leisure, Inc. v. Haber*,
  972 So. 2d 1069 (Fla. 5th DCA 2008) .........................................................................7, 8

*Klinger v. Weekly World News, Inc.*,
  747 F. Supp. 1477 (S.D. Fla. 1990) ...............................................................................17

*Legg v. Wyeth*,
  428 F.3d 1317 (11th Cir. 2005) ............................................................................ passim

*Marrache v. Bacardi U.S.A., Inc.*,
  17 F.4th 1084 (11th Cir. 2021) ......................................................................................16

*Oliva v. NBTY, Inc.*,
  2011 WL 13103994 (S.D. Fla. Sept. 12, 2011) ..................................................................4

*Otoh v. Fed. Nat'l Mortg. Ass'n*,
  2025 WL 915028 (11th Cir. Mar. 26, 2025)...............................................................3, 4, 5

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
  842 So. 2d 773 (Fla. 2003).............................................................................................15

*Restivo v. Bank of America Corp.*,
    618 F. App'x 537 (11th Cir. 2015) ..........................................................................................18

*Rollins, Inc. v. Heller*,
    454 So. 2d 580 (Fla. 3d DCA 1984) ........................................................................................16

*Smith v. 2001 S. Dixie Highway, Inc.*,
    872 So. 2d 992 (Fla. 4th DCA 2004) ........................................................................................16

*Stewart v. Wilmington Tr. SP Servs., Inc.*,
    112 A.3d 271 (Del. Ch. 2015).....................................................................................................6

*Stillwell v. Allstate Ins. Co.*,
    663 F.3d 1329 (11th Cir. 2011) .........................................................................................4, 17

*Tobinick v. Novella*,
    848 F.3d 935 (11th Cir. 2017) ................................................................................................14

*United HealthCare of Fla., Inc. v. Brown*,
    2006 WL 8433492 (S.D. Fla. June 7, 2006) ..........................................................................11

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963)..................................................................................................................12

*Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*,
    123 So. 3d 1149 (Fla. 5th DCA 2012).............................................................................16, 17

**STATUTES**

12 U.S.C. § 1813(u)(1) ....................................................................................................................9

12 U.S.C. § 1818...........................................................................................................................10

12 U.S.C. § 1851...........................................................................................................................11

15 U.S.C. § 6802...........................................................................................................................13

28 U.S.C. § 1332.............................................................................................................................3

31 U.S.C. § 5318(h)(1) ..................................................................................................................11

Fla. Stat. § 501.202(2).................................................................................................................14

Fla. Stat. § 501.203(2)...................................................................................................................5

Fla. Stat. § 501.203(8)................................................................................................14, 16

Fla. Stat. § 501.212(4)....................................................................................................11

Fla. Stat. § 501.212(4)(c) ........................................................................................5, 9, 11

Fla. Stat. § 655.0323(7)....................................................................................................5

**REGULATIONS**

12 C.F.R. pt. 30, Appendix D.II.C.1 ...............................................................................11

12 C.F.R. pt. 30, Appendix D.II.D..................................................................................11

12 C.F.R. § 21.21 ............................................................................................................11

12 C.F.R. § 248.20(c)......................................................................................................11

31 C.F.R. § 1020.210.......................................................................................................11

Notice of Removal, Dkt. 1 ....................................................................................... passim

**OTHER AUTHORITIES**

House Bill 989 (2024)........................................................................................................5

Defendants JPMorgan Chase Bank, N.A. ("JPMorgan") and James Dimon (together, "Defendants") submit this memorandum of law in opposition to Plaintiffs' Motion for Remand and Incorporated Memorandum of Law.

## INTRODUCTION

Plaintiffs brought this suit against JPMorgan for closing certain of their bank accounts and then allegedly placing Plaintiffs on a supposed "blacklist" that they claim impaired their ability to obtain services from other banks. Even though this case is entirely about JPMorgan's alleged conduct, Plaintiffs added a single claim against JPMorgan's CEO, Mr. Dimon—alleging that he "directed" JPMorgan in the alleged blacklisting. Plaintiffs' makeweight claim against Mr. Dimon is meritless and cannot divest the federal courts of authority to resolve the claims between Plaintiffs and JPMorgan, who are unquestionably of diverse citizenship. The doctrine of fraudulent joinder exists precisely to prevent such gamesmanship. Because the claim against Mr. Dimon has no chance of success—for numerous independent reasons—Mr. Dimon's improper addition to this lawsuit does not affect this Court's diversity jurisdiction.

First, the statute under which Plaintiffs sued JPMorgan's CEO—the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")—expressly exempts federally regulated bank officers acting in their official capacities, such as Mr. Dimon's alleged "direction" of JPMorgan here, in two independent ways: (a) because actions taken on behalf of a bank are protected by the safe harbor exemption for the bank itself, and (b) because JPMorgan's CEO is protected by the safe harbor exemption as a "person" regulated by the federal banking agencies. Second, under binding Florida case law, FDUTPA applies only to conduct that Plaintiffs do not allege occurred (*commercial* acts in "trade or commerce") and permits only damages that Plaintiffs do not seek ("*actual*," as opposed to consequential, damages). Third, Plaintiffs have failed to assert necessary threshold facts about the alleged blacklist—including what it entails, when Plaintiffs were

blacklisted, to whom it was supposedly circulated, or even how they purport to have learned about it. These failures confirm that Plaintiffs' FDUTPA claim against Mr. Dimon—and the alleged blacklist that underlies it—is simply a contrivance to try to deprive this Court of jurisdiction.

Defendants set forth all of these points in their Notice of Removal, Dkt. 1 ("Notice"). Plaintiffs' remand motion does not overcome them. They fail entirely to address key legal deficiencies that plague their FDUTPA claim. Instead, their central strategy is to emphasize, over and over, the showing necessary to establish fraudulent joinder. But that test is not a free pass for Plaintiffs. It simply requires the court to "apply[] reason and common sense" to determine whether there is any "reasonable, not merely theoretical" chance that Plaintiffs have a claim against Mr. Dimon. *Legg v. Wyeth*, 428 F.3d 1317, 1325 n.5 (11th Cir. 2005). As demonstrated below, they do not.

Plaintiffs concede, as they must, that the FDUTPA safe harbor forecloses liability against JPMorgan. Their emphatic assertion that corporate officers can sometimes be sued alongside a corporation that *is liable* under FDUTPA ignores the dispositive point here: because the bank is categorically *not liable*, there is no way that the CEO's official conduct on behalf of the bank could be the basis for corporate-officer liability. Plaintiffs also fail to point to any authority or rationale for their claim that being regulated as an "institution-affiliated party" ("IAP") is insufficient to independently qualify JPMorgan's CEO as an exempt person regulated by the federal banking agencies. And while Plaintiffs are wrong that the safe harbor—exempting any "person or activity" regulated by the federal banking agencies—is available only where both the "person" and "activity" are federally regulated, their own allegations squarely demonstrate that the conduct alleged here would fall within the heartland of federally regulated activity in any event.

Plaintiffs' remaining arguments fare no better. They offer no response to Defendants' specific authorities holding that conduct in "trade or commerce"—required to state a claim under FDUTPA—does not include the voluntary sharing of information with a third party outside the context of a commercial transaction, which is all Plaintiffs allege here. Similarly, they ignore cases cited in the Notice of Removal holding that consequential damages like reputational harm do not satisfy FDUTPA's requirement of "actual damages," and the cases they cite in response are wholly irrelevant. Finally, they offer no defense of their facially deficient factual allegations. Contrary to their claim, courts routinely consider such pleading deficiencies as part of the fraudulent-joinder analysis, and Plaintiffs' allegations do not come close to meeting the applicable standard.

This Court should thus rule that Mr. Dimon was fraudulently joined to this lawsuit and deny Plaintiffs' Motion to Remand.[1]

## ARGUMENT

### I.      Plaintiffs Exaggerate the Fraudulent Joinder Standard

Plaintiffs' principal argument for remand is, in essence, that the fraudulent joinder doctrine sets an impossibly high bar. But Plaintiffs misstate the applicable standard, which—while demanding—is met where, as here, Plaintiffs' claim is foreclosed by law or their own pleading failures.

Defendants may "establish fraudulent joinder" by showing with "clear and convincing evidence that … there is no possibility the plaintiff can establish a cause of action against the fraudulently joined party." *Otoh v. Fed. Nat'l Mortg. Ass'n*, 2025 WL 915028, at *3 (11th Cir.

---

[1] Plaintiffs do not dispute that, if this Court concludes that Mr. Dimon was fraudulently joined, it has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the Plaintiffs and JPMorgan, the only other Defendant, and the amount in controversy exceeds $75,000.

Mar. 26, 2025). Plaintiffs' assertion that, under this standard, the Court may not "weigh the merits of the claim" is a substantial exaggeration. Plaintiffs' Motion for Remand 5, Dkt. 31 ("Mot."). Although the Court may not adjudicate the merits when there is a "reasonable" dispute, the Court must find fraudulent joinder when, "applying reason and common sense," there is no dispute—or a "merely theoretical" dispute—as to whether "Plaintiffs have a viable claim." *Legg*, 428 F.3d at 1325 n.5. Thus, the Court may apply settled law to a new set of facts when the result under state law is clear. *See, e.g.*, *Otoh*, 2025 WL 915028, at *4 (finding "no possibility [plaintiff] could establish a valid cause of action" where plaintiff "failed to demonstrate that the Defendants' foreclosure conduct rose to the level of extreme and outrageous to sustain an intentional infliction of emotional distress claim under Georgia law"). Similarly, asserted issues of fact cannot preclude a finding of fraudulent joinder when they are not genuine under "the pleading standards applicable in state court," *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1334 (11th Cir. 2011), or not material to a plaintiff's chances of success.

Courts thus often rule that a party was fraudulently joined in circumstances just like these, where the plain language of a state statute precludes liability against a defendant. In *Bolden v. Nautilus Insurance Co.*, 2023 WL 4614509, at *2 (11th Cir. July 19, 2023), for example, the Eleventh Circuit affirmed the denial of remand because "[n]either the statute nor case law support[ed] a suit against" the non-diverse defendant, given its relationship to the dispute. Similarly, in *Oliva v. NBTY, Inc.*, 2011 WL 13103994, at *5 (S.D. Fla. Sept. 12, 2011), the court denied remand because the Defendant was "statutorily immune from Plaintiff's negligence claim."

The problems with Plaintiffs' claim against Mr. Dimon fit squarely within these well-established principles. As explained below and in Defendants' Notice of Removal, Plaintiffs' sole claim against Mr. Dimon cannot succeed on its face because FDUTPA's statutory safe harbor

4

precludes liability against him—and because Plaintiffs further fail to allege in-scope conduct or damages, or even the basic facts of their claim against him.  Nor do Defendants' fraudulent joinder arguments require the court to resolve disputed issues of fact.  Accordingly, under the applicable standard, there is no reasonable dispute as to whether Plaintiffs' claim against JPMorgan's CEO could possibly succeed.  This Court therefore should hold that Mr. Dimon was fraudulently joined to this lawsuit and dismiss him from the case.  *See Otoh*, 2025 WL 915028, at *3 ("When a plaintiff names a non-diverse defendant solely to defeat federal diversity jurisdiction, the district court must ignore the non-diverse defendant and deny any motion to remand the case to state court based on the presence of the 'fraudulently joined' party.").

## II.     FDUTPA's Banking Safe Harbor Forecloses Liability Against Mr. Dimon

The sole claim against JPMorgan's CEO, an alleged violation of FDUTPA, is barred by the plain text of the statute, which expressly precludes liability against both federally regulated banks and individuals regulated by the federal banking agencies.  *See* Fla. Stat. § 501.212(4)(c). Plaintiffs attempt to manufacture ambiguities in the statute to undermine this conclusion, but they fail to point to any alternative interpretation plausibly supported by "reason and common sense." *Legg*, 428 F.3d at 1325 n. 5.

### A.      FDUTPA's safe harbor for federally regulated banks bars Plaintiffs' claim against Mr. Dimon.

Federally regulated banks like JPMorgan are expressly exempted from FDUTPA.  *See* Fla. Stat. § 501.212(4)(c); *In re Kachkar*, 769 F. App'x 673, 682 (11th Cir. 2019) ("Because [Bank of America, N.A.] is a federally regulated bank, the Act does not apply to it.").[2]  That exemption

---

[2] The Florida legislature recently modified FDUTPA's safe harbor by allowing Florida State Attorneys or the Department of Legal Affairs to proceed against banks for certain violations. *See* House Bill 989 (2024), codified at Fla. Stat. § 655.0323(7); *see also* Fla. Stat. § 501.203(2). But that provision by its terms precludes private enforcement for such violations, confirming the

dictates that a bank's conduct is beyond the reach of FDUTPA. In turn, an officer acting on behalf of the bank cannot be held liable for directing or participating in bank conduct that is expressly exempted from FDUTPA's coverage. Indeed, the actions of a corporate officer in his official capacity *are* the actions of the company. *See In re Kapila*, 762 F. App'x 991, 994 (11th Cir. 2019) ("[W]rongdoing by a corporate officer is imputed to the company so long as the officer acts within the scope of his employment."); *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch. 2015) ("A basic tenet of corporate law … is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."). It makes no sense to assert that a CEO can be liable for causing the company to take an action where the company is exempt from liability.

But that is precisely what Plaintiffs do here. They allege that Mr. Dimon is liable as the CEO of JPMorgan for directing JPMorgan to place them on the alleged blacklist. But they concede, as they must, that JPMorgan itself is statutorily exempt from liability under FDUTPA for this exact same conduct. *See* Mot. 10 ("[T]he statute unambiguously excludes banks." (quoting *Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 779 (Fla. 5th DCA 2007))). Notwithstanding their denial, *see* Mot. 9, Plaintiffs are indeed attempting an end-run around FDUTPA's banking safe harbor.[3]

Plaintiffs claim that "Florida law recognizes no [] limitation" on their tactic. Mot. 9. That is wrong. Florida law prohibits this exact maneuver by allowing a FDUTPA claim alleging corporate wrongdoing to proceed against an individual *only when* liability is also available against

---

lack of any private right of action against banks under FDUTPA.

[3] The Complaint does not disguise that this is what Plaintiffs are attempting, at one point even alleging that both "Defendants"—not just JPMorgan's CEO—"engaged in an unfair and deceptive trade practice by directing the publication of the names of Plaintiffs." Compl. at 4.

the corporation: "[A]n individual may be liable for corporate practices … *once corporate liability is established.*" *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1073 (Fla. 5th DCA 2008) (emphasis added)); *cf. FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356, 1364 (S.D. Fla. 2016) ("Individuals can be held liable for corporate practices that violate the [Federal Trade Commission Act ("FTCA")] …, *but only if the FTC has first established the corporation's liability.*" (emphasis added) (citation omitted)).   If the law were otherwise, the FDUTPA exemption would be meaningless, because every corporate action is performed through individuals.

Contrary to Plaintiffs' claim, there is nothing "novel" about the principle that a corporate officer can be liable only when the corporation is. Mot. 10.  As explained in Defendants' Notice of Removal, Florida adopted this principle from the FTCA context, where it has long been the settled rule.  *See* Notice ¶ 14 n.8 (citing *KC Leisure*, 972 So. 2d at 1073).  It is therefore unsurprising that neither Plaintiffs nor Defendants have uncovered *a single case* in which a party *even attempted* to establish officer liability where the company itself is concededly exempt.  That lack of precedent thus does not preclude a finding of fraudulent joinder, Mot. 10; it simply reflects that Plaintiffs' theory is obviously wrong.  As the Eleventh Circuit has explained, "[t]he potential for legal liability must be reasonable, not merely theoretical"; a squarely controlling state-court decision is not required where "reason and common sense" demonstrate that Plaintiffs' claim must fail.  *Legg*, 428 F.3d at 1324 n.5.

Unable to refute this straightforward principle, Plaintiffs instead cherry-pick irrelevant points from the governing case law.  They cite *KC Leisure* for the unremarkable notion that "[c]orporate officers may be individually liable for their own deceptive conduct when they personally participate in the wrongful acts" of a corporation.  Mot. 9 (citing 972 So. 2d at 1073–74).  But to repeat: as *KC Leisure* emphasizes, 972 So. 2d at 1073, in order for that rule to apply,

liability must be available against the company under FDUTPA. And a federally regulated bank's conduct is not actionable under FDUTPA because such banks are protected by the safe harbor. As a result, there can be no individual liability against a bank's officer for directing or participating in the bank's exempted conduct.

Plaintiffs also rely on *Basciano* for the proposition that "bank subsidiaries, affiliates or agents" are not categorically exempt from FDUTPA. Mot. 10 (quoting *Basciano*, 960 So. 2d at 779). But *Basciano* uses the word "agents" to refer to third-party businesses that have only a contractual relationship with a bank, like the loan servicer in that case. *See* 960 So. 2d at 778–79. A third party can independently violate the statute through its own conduct unrelated to anything the bank does. But as Plaintiffs acknowledge, a corporate officer's liability requires "participat[ing]" in the bank's allegedly wrongful activity, Mot. 9, tying the officer's culpability to the bank's. That is especially true here, where Plaintiffs' claims against Mr. Dimon are based solely on how he directed *the bank* to act.

Far from supporting Plaintiffs, two aspects of *Basciano*'s reasoning confirm that Plaintiffs have no chance of success on the merits. First, *Basciano* makes clear that "a bank acting directly [is] exempt from FDUTPA liability." 960 So. 2d at 779. Yet a bank can only "act[] directly" through people—its officers and employees. Thus, preventing officers and employees (such as JPMorgan's CEO) who are acting in their official capacity from relying on the bank's safe harbor would render it a nullity. The safe harbor would protect banks in name only while exposing every individual through whom the bank necessarily operates (many of whom are likely subject to indemnification by the bank) to the very liability the statute was intended to foreclose. No reasonable person could "believe this is a result intended by the Legislature." *Id.* Mr. Dimon's

official acts *are* the bank's acts, and the Florida legislature's decision to foreclose liability for those acts dooms Plaintiffs' FDUTPA claim against him.

Second, *Basciano* indicates that FDUTPA's safe harbor does not cover bank's third-party agents because those agents are not subject to the same "extensive federal administrative controls that ha[ve] been imposed on banks." *Id.* (citing *Fed. Trade Comm'n v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994)).  That rationale confirms, rather than undermines, Defendants' position—because Mr. Dimon is subject to those same federal administrative controls. As an IAP, he is subject to cease-and-desist orders, civil penalties, removal from office, and an array of affirmative regulatory obligations.  *See infra* Part II.B.  Because any alleged misconduct by Mr. Dimon, acting as CEO of a federally regulated bank, would be policed by federal banking regulators, the same logic that justifies the safe harbor's application to JPMorgan also requires extending it to Mr. Dimon's actions on behalf of the bank.

In short, when a company cannot be held liable because it is covered by FDUTPA's safe harbor, the company's *own officers* cannot be held liable either.  On this ground alone, Plaintiffs' motion should be denied.

**B.      FDUTPA's safe harbor applies to Mr. Dimon because he is an "institution-affiliated party" regulated under federal banking laws.**

JPMorgan's CEO is also independently exempt from liability under FDUTPA as a "person … regulated by federal agencies" administering banking laws.  Fla. Stat. § 501.212(4)(c).  As set out in detail in the Notice of Removal, Mr. Dimon's official acts fall squarely within this safe harbor because he is comprehensively regulated as an IAP under federal banking law, subject to enforcement actions by the Office of the Comptroller of the Currency ("OCC") including cease-and-desist orders, civil penalties, and removal from office.  12 U.S.C. § 1813(u)(1); *see* also Notice

5–6. Section 501.212(4)(c)'s clear application to Mr. Dimon thus independently demonstrates that he was fraudulently joined to this action and must be dismissed. *See Legg*, 428 F.3d at 1324.

Plaintiffs concede that JPMorgan's CEO is subject to the "enforcement authority" of the federal banking agencies, but nonetheless argue that this does not mean he is "regulated under laws administered by" those agencies. Mot. 12. That is incorrect. Enforcement actions against IAPs under 12 U.S.C. § 1818 cannot occur in a vacuum; the remedies authorized by that section can be sought only when an IAP has committed an "unsafe or unsound practice" or otherwise violated banking law. *Id.* § 1818(b). "The term 'unsafe or unsound practice' is widely used in banking statutes, regulations, and supervisory materials"; it has been a pillar of federal banking regulation for nearly a century. *In the Matter of Patrick Adams Former President and Chief Executive Officer T Bank, N.A. Dallas, Texas*, Dkt. AA-EC-11-50, 2014 WL 8735096, at *12 (O.C.C. Sept. 30, 2014). The banking agencies bring enforcement actions to both punish unsafe and unsound practices and ensure that the regulated community understands what is and is not prohibited. *See, e.g.*, *In the Matter of John Stumpf Former Chairman and Chief Executive Officer Wells Fargo Bank, N.A. Sioux Falls, South Dakota*, Dkt. AA-EC-2019-83, No. 2020-004 (O.C.C. Jan. 22, 2020) https://www.occ.gov/static/enforcement-actions/ea2020-004.pdf (IAP subject to enforcement for unethical sales practices that are an "unsafe and unsound practice"); *In the Matter of Patrick Adams*, 2014 WL 8735096 (O.C.C. Sep. 30, 2014) (IAP subject to enforcement for improper risk management that is an "unsafe and unsound practice"). That amounts to being "regulated under laws administered by" the federal banking agencies.

Further, JPMorgan's CEO is subject to a wide range of affirmative obligations under specific banking laws and regulations. *See* Notice ¶ 9 n.4. For example, federal law requires every financial institution and its officers to maintain an anti-money-laundering ("AML") compliance

10

program that conforms to the requirements of the Bank Secrecy Act, including procedures that enable the institution to assess the risks of their customers and conduct ongoing monitoring to identify and report suspicious transactions. *See* 31 U.S.C. § 5318(h)(1); 12 C.F.R. § 21.21; 31 C.F.R. § 1020.210. Mr. Dimon is also responsible for developing JPMorgan's strategic plan, 12 C.F.R. Part 30, App. D.II.D, and for holding front line staff and the independent risk management function accountable for effective risk management, 12 C.F.R. Part 30, App. D.II.C.1. And as the CEO of a large, complex bank holding company, he is required to (among other things) attest annually to yet another federal regulator, the Federal Reserve, that the bank has in place and maintains the compliance program required under the Volcker Rule. 12 C.F.R. § 248.20(c); *see* 12 U.S.C. § 1851. Mr. Dimon is thus indisputably a "person … regulated by federal [banking] agencies." Fla. Stat. § 501.212(4)(c).

Plaintiffs also argue that, even if Mr. Dimon is a regulated "person," the safe harbor does not apply to him in this case because the "alleged conduct" relevant to the blacklisting claims is not an "activity" regulated by federal banking agencies. Mot. 11. This too is wrong: Mr. Dimon is exempt as a regulated "person" regardless of whether the alleged blacklist—if it actually existed—is an "activity" regulated by federal banking law. And in any event, the alleged blacklisting would indeed be an "activity" regulated by federal banking law.

*First*, since Mr. Dimon is a regulated "person," he is exempt from FDUTPA regardless of whether the "activity" in which he allegedly engaged is regulated by federal banking law. The "exemptions enumerated in [section 501.212(4)] apply to any 'person *or* activity,' not any person *and* activity." *CMR Constr. & Roofing, LLC v. Am. Cap. Assur. Corp.*, 2021 WL 354167, at *3 (M.D. Fla. Feb. 2, 2021) (quoting Fla. Stat. § 501.212(4)); *see also United HealthCare of Fla., Inc. v. Brown*, 2006 WL 8433492, at *2 (S.D. Fla. June 7, 2006) (holding that Plaintiffs' reading

11

"appears to contradict the plain language of the statute" and also runs contrary to FDUTPA's legislative history, which explains that the statute provides "'a blanket exemption from the provisions of the FDUTPA, even if the activity in which the person is engaging is not regulated by the agency'" (quoting Senate Staff Analysis and Economic Impact Statement, S.B. 208, Reg. Sess., at § 11, *4 (Fla. 2001))). As the Eleventh Circuit has explained, "The use of the disjunctive 'or' indicates alternatives and requires that those alternatives be treated separately." *Dacostagomez-Aguilar v. U.S. Att'y Gen.*, 40 F.4th 1312, 1316 (11th Cir. 2022) (citation modified). By using "or" instead of "and," the Florida legislature clearly indicated its intent to avoid interfering in the entire sphere of federal banking oversight, including in areas where the banking agencies have chosen *not* to impose regulatory restrictions. *Cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 336 n.11 (1963) (explaining that banks are exempt from the FTCA—the template for FDUTPA—because they are "already subject to extensive federal administrative controls," regardless of whether the specific activity in question has been regulated).

Plaintiffs cite several cases applying the "activity" prong, but none of those cases hold or even suggest that for a regulated "person" to be covered by the FDUTPA safe harbor, their alleged "activity" *also* must be regulated by identified government agencies. Take, for example, *Bowe v. Public Storage*, 106 F. Supp. 3d 1252 (S.D. Fla. 2015), which is Plaintiffs' lead authority. The court began its analysis by noting that the defendant corporation was "not an insurance company regulated by [the insurance regulator]." *Id.* at 1267. "*Therefore*," the court concluded, the question became "whether the activity that is the subject of this lawsuit is subject to the regulatory authority of" the regulator. *Id.* at 1267–68. In other words, it was only necessary for the court to ask whether the company engaged in regulated "activity" because the defendant was *not* a regulated "person." *See also CMR Constr.*, 2021 WL 354167, at *3 ("CMR concedes that AmCap—an insurance

12

company—is a 'person' regulated ….   This concession necessarily means that AmCap is not subject to FDUTPA.").

*Second*, if the alleged blacklist did exist, its use would be regulated by federal banking agencies.  Plaintiffs' claim is thus barred by FDUTPA's safe harbor even assuming, for the sake of argument, that Mr. Dimon must also satisfy the "activity" prong.  Plaintiffs' own description of the alleged blacklist makes clear that it concerns regulated activity.  The alleged blacklist is supposedly used to share information between banks about customers who are non-compliant with applicable banking rules and regulations.  Compl. at 4.  As described in the Notice of Removal, the federal banking agencies directly regulate the sharing of customer information between financial institutions: federal law prohibits banks from sharing nonpublic personal information of consumers with nonaffiliated third parties, such as other banks, and there are special rules that apply to lists of bank customers.  Notice ¶¶ 29–30; *see, e.g.*, 15 U.S.C. § 6802.[4]  Plaintiffs ignore this discussion when they assert that Defendants have not "identified [a] regulatory framework governing" the alleged blacklist.  Mot. 13.

In sum, under binding Florida case law and the plain statutory text, Plaintiffs cannot possibly establish liability against JPMorgan's CEO because FDUTPA's safe harbor exempts him for multiple independent reasons.  "[A]pplying reason and common sense," Plaintiffs' assertion of this facially barred claim has "no reasonable possibility" of success.  *Legg*, 428 F.3d at 1324, 1325 n.5.  Mr. Dimon was fraudulently joined and his citizenship therefore cannot impair this Court's authority to decide the case.

---

[4] Plaintiffs also suggest that JPMorgan's alleged "debanking" is not governed by any "federal statute or regulation."  Mot. 13.  But Count II, Plaintiffs' sole claim against Mr. Dimon, does not involve "debanking," and those allegations are thus irrelevant to the fraudulent-joinder issues.

### III.   Plaintiffs' Allegations Are Beyond the Scope of FDUTPA

Plaintiffs' claim against Mr. Dimon separately has no reasonable possibility of success because it does not allege either conduct or damages that fall within FDUTPA's scope. These fundamental failures confirm that JPMorgan's CEO has been fraudulently joined.

### A.   Plaintiffs do not allege that Mr. Dimon engaged in conduct in trade or commerce for purposes of FDUTPA.

Plaintiffs have not pleaded that Mr. Dimon engaged in the "conduct of any trade or commerce" in connection with their alleged blacklisting, so their FDUTPA claim has no chance of success. Fla. Stat. § 501.204(1). For the publication of allegedly defamatory speech to qualify as conduct in trade or commerce, the speech must be "commercial speech." *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020); *see id.* ("Where the allegedly violative action is the publication of information, [FDUTPA] applies only to commercial speech—or, 'expression related solely to the economic interests of the speaker and its audience.'" (quoting *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017))). But Plaintiffs do not allege that JPMorgan engaged in speech about its own products or services in the course of "propos[ing] a commercial transaction." *Tobinick*, 848 F.3d at 950. Rather, they allege that JPMorgan used a supposed inter-bank blacklist to share information about customers suspected of wrongful banking activity, which has no connection to JPMorgan's own advertising or offerings made in trade or commerce. As described by Plaintiffs, the alleged blacklist is a tool for voluntarily sharing information among banks—not the "advertising, soliciting, providing, offering, or distributing … of any good or service, or any property." Fla. Stat. § 501.203(8).

Indeed, it is settled law that voluntarily sharing information with third parties—that is, parties to whom one is not offering a sale or service—is not actionable under the statute. *See AMG Trade & Distrib., LLC v. Nissan N. Am., Inc.*, 813 F. App'x 403, 408 (11th Cir. 2020) (concluding

14

that a car manufacturer's statements to customs officials about whether the plaintiff's shipment of auto parts was authentic was not conduct in trade or commerce).  This case is just like *AMG Trade*: The alleged blacklist concerns compliance-related information voluntarily reported by a business to non-customer entities.  Such communications to a third party do not qualify as actionable conduct under FDUTPA, even if they allegedly damage a plaintiff's reputation.  Nor, given FDUTPA's limitation that only actual damages may be awarded for a violation, does such conduct generate cognizable damages under FDUTPA.  *See infra* Part III.B.  The alleged blacklisting activity therefore falls outside of FDUTPA's scope.

Against all this, Plaintiffs offer a single, inapposite case.  *See* Mot. 16 (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773 (Fla. 2003)).  In *PNR*, the court vacated the dismissal of a FDUTPA verdict for a restaurant against its landlord based on the theory that "the [landlord's] failure … to properly maintain the premises constituted unfair and deceptive trade practices."  842 So. 2d at 774.  But the offending conduct's nexus to trade or commerce was not at issue in that case, and in any event, the relevant conduct—offering and managing a lease of property—was plainly commercial.  *See id.*  The court in *PNR* also did not address whether allegedly tortious *speech* qualifies as conduct in trade or commerce under FDUTPA—which is all Plaintiffs allege here.  (Indeed, *PNR* addressed only the theoretical question whether "deceptive acts involving a single party in a single transaction," rather than a regular or systematic practice, are legally actionable under FDUTPA; the court did not otherwise consider the merits of the particular claim at issue in that case.  *Id.* at 775.)

Put simply, *PNR* has nothing to do with this case.  Defendants have not argued that FDUTPA only applies to "traditional point-of-sale misrepresentation[s] to a consumer."  Mot. 16.  The point is that there must be at issue some "advertising, soliciting, providing, offering, or

15

distributing, whether by sale, rental, or otherwise, of any good or service, or any property." Fla. Stat. § 501.203(8). That was plainly the case with the lease of real property in *PNR*, but is plainly *not* the case here.

### B. Plaintiffs do not allege that they suffered any actual damages.

Plaintiffs' FDUTPA claim independently fails because the Complaint does not allege the requisite "actual damages." *See Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1101 (11th Cir. 2021) ("FDUTPA requires an aggrieved person to suffer actual damages"). The term "actual damages" has a specific meaning under FDUTPA; it means "'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984) (citation omitted). Here, Plaintiffs' purported damages of "$5,000,000,000.00" in "financial and reputational harm" from the alleged blacklisting, Compl. ¶ 98, are in no way connected to any conception of the value of any services Plaintiffs received from Mr. Dimon.

Plaintiffs baldly assert that "Florida courts recognize that FDUTPA damages include, *inter alia*, loss of goodwill and reputational harm." Mot. 17. But they make no effort to square that assertion with the cases cited in the Notice of Removal holding that "[a]ctual damages, as pertaining to FDUTPA, does not include 'actual consequential' damages" such as reputational harm. *Smith v. 2001 S. Dixie Highway, Inc.*, 872 So. 2d 992, 994 (Fla. 4th DCA 2004); *see also Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) ("'[H]arm in the manner of competitive harm, diverted or lost sales, and harm to the goodwill and reputation' are consequential damages." (citation omitted)); Notice ¶¶ 20–21. Instead, Plaintiffs cite two decisions that only underscore their pleading failures. *See* Mot. 17. The first, *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149 (Fla. 5th DCA 2012), states

16

that ongoing damage to goodwill may be actionable in a FDUTPA action for forward-looking "injunctive relief," but it acknowledges that for alleged past harm only "actual damages" are recoverable. *Id.* at 1152; *see also id.* (citing *Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477 (S.D. Fla. 1990), for the proposition that the "scope of [FDUTPA's] injunctive remedy is greater than [the] actual damage remedy under section 510.211(2)"). Here, however, Plaintiffs do not seek injunctive relief, making this case irrelevant. The second case cited by Plaintiffs, *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach County, Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015), is even further afield—the plaintiff sought injunctive relief alongside damages, and the court simply reiterated the "actual damages" rule without using any language even remotely suggesting that consequential damages are recoverable under FDUTPA. *Id.* The damages available in a FDUTPA case were simply not at issue. *See id.*

Moreover, even if reputational harm could constitute actual damages in some cases, Plaintiffs have not pleaded any facts suggesting that they suffered actual damages here. Plaintiffs request a self-evidently punitive award of $5 billion without even attempting to tie that number to any cognizable harm, such as damaged business opportunities or relationships—let alone a harm inflicted by *Mr. Dimon*. Plaintiffs' complete failure to plead actual damages under FDUTPA means that their claim has no chance of success.

## IV. Plaintiffs Do Not and Cannot Plead the Basic Facts of Their FDUTPA Claim

Finally, Plaintiffs' FDUTPA claim against JPMorgan's CEO fails to allege several basic facts necessary to have even a possibility of establishing liability against him.

Plaintiffs were required to, at a minimum, "state their pleadings with sufficient particularity for a defense to be prepared." *Horowitz v. Laske*, 855 So. 2d 169, 172–73 (Fla. 5th DCA 2003); *see also Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009) (explaining the heightened pleading standard for claims sounding in fraud); *Stillwell*, 663 F.3d at

17

1334 (holding that, to assess whether a plaintiff has sufficiently pleaded his claims to defeat fraudulent joinder, "we must necessarily look to the pleading standards applicable in state court"). Plaintiffs come nowhere close to satisfying this standard.  The Complaint lacks any specific allegations concerning who learned about the alleged blacklist; from whom they learned it; when the alleged blacklist was purportedly published; what the alleged blacklist entails; which banks accessed it; or even which Plaintiffs were placed on it.  Plaintiffs also state in conclusory fashion that their placement on the alleged blacklist "induced other federally regulated banks in the United States … to not carry on business relationships with [Plaintiffs]," Compl. ¶ 58, but they do not name any particular banks that were allegedly so induced.  Without any of these necessary details, Plaintiffs have no reasonable possibility of meeting the applicable pleading standard.  *See Ground & Pipe Techs., LLC v. Firstliner Techs., Inc.*, 2005 WL 8163041, at *3 (N.D. Fla. Oct. 5, 2005).

Plaintiffs offer no response to the above points.  Instead, their sole argument is that deficient fact pleadings are not a basis to dismiss at the fraudulent-joinder stage.  Mot. 17–18. They are wrong.  The law in this Circuit is clear that a motion to remand should be denied when the allegations in a complaint are too vague or conclusory to make out a possible claim against a fraudulently joined defendant.  For example, the Eleventh Circuit held in *Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132 (11th Cir. 2020), that plaintiffs had fraudulently joined a defendant because the plaintiffs' "allegations [were] speculative, and, without more, conclusory. … [T]he plaintiffs needed to also provide *factual allegations* to show that it was possible to make out their claims." *Id.* at 135.  The same is true when the heightened pleading standard for fraud applies. *See Restivo v. Bank of America Corp.*, 618 F. App'x 537, 540 (11th Cir. 2015) (holding that common-law fraud claim constituted a fraudulent joinder because the plaintiff had "not stated with particularity any circumstances constituting fraud").  Plaintiffs' "speculative" and

"conclusory" references to an alleged blacklist without any supporting facts—such as when or how they learned of it—that would necessarily be in their possession if the alleged blacklist actually existed further underscores that their FDUTPA claim is a contrivance with no chance of success. *Illoominate*, 841 F. App'x at 135.

For this independent reason, Plaintiffs' FDUTPA claim against JPMorgan's CEO has "no reasonable possibility" of success. *Legg*, 428 F.3d at 1324, 1325 n.5. It is clear that Plaintiffs have fraudulently joined Mr. Dimon. This Court should reject their attempt to improperly strip this Court of its diversity jurisdiction.

## CONCLUSION

The Court should deny Plaintiffs' Motion to Remand.

19

Date: April 13, 2026

Respectfully submitted,

/s/ Eliot Pedrosa
Eliot Pedrosa
Fla. Bar No. 182443
Kelly A. Carrero
Fla. Bar No. 1072663
JONES DAY
600 Brickell Ave, Suite 3300
Miami, FL 33131
Telephone: (305) 714-9700
Facsimile: (305) 713-9799
Email: epedrosa@jonesday.com
Email: kacarrero@jonesday.com

Noel J. Francisco (admitted *pro hac vice*)
Charlotte H. Taylor (admitted *pro hac vice*)
JONES DAY
51 Louisiana Ave, NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: njfrancisco@jonesday.com
Email: ctaylor@jonesday.com

Jayant W. Tambe (admitted *pro hac vice*)
Amanda L. Dollinger (admitted *pro hac vice*)
JONES DAY
250 Vesey St
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email: jtambe@jonesday.com
Email: adollinger@jonesday.com

Derek E. León
Fla. Bar No. 625507
LEÓN COSGROVE JIMÉNEZ, LLP
255 Alhambra Cir, 8th Floor
Miami, FL 33134
Telephone: (305) 740-1975
Facsimile: (305) 351-4059
Email: dleon@leoncosgrove.com

*Attorneys for Defendants*
*JPMorgan Chase Bank, N.A. and James Dimon*

20

**CERTIFICATE OF SERVICE**

On April 13, 2026, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

/s/ *Eliot Pedrosa*
Eliot Pedrosa, Esq.

*Attorney for Defendants*
*JPMorgan Chase Bank, N.A. and James Dimon*

21